PHILIP B. PRICE, SBN 32620
LINDA SCHULKEN, SBN 178382
PRICE & BROWN
Attorneys at Law
466 Vallombrosa Avenue
P. O. Box 1420
Chico, California 95927
Telephone: (530) 343-4412
Facsimile: (530) 343-7251

THOMAS P. GUARINO, SBN 149409
Siskiyou County Counsel
P. O. Box 659
Yreka, California 96097
Telephone: (530) 842-8100
Facsimile: 530) 842-7032

Attorneys for Siskiyou County, Rick Riggins,
and Nathan Mendes

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENCE HAROLD WHITE III,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SISKIYOU, RICK RIGGINS, individually and as SHERIFF OF SISKIYOU COUNTY NATHAN MENDES, and DOES 1 through 50, inclusive,<br><br>Defendants.<br>_____/ | Case No. 2:07-CV-00359-MCE-CMK<br><br>DECLARATION OF NATHAN MENDES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br>[FRCP Rule 56(b)]<br><br>Hearing Date: February 6, 2009<br>Time: 9:00 a.m.<br>Courtroom: Ctrm 7, 14thFloor |

I, NATHAN MENDES, declare:

1. I am currently employed by the County of Siskiyou in its Sheriff's Department, as a Detective.

2. That on December 31, 2005 and on January 11, 2006 I was employed by the County of Siskiyou as a Deputy Sheriff assigned to the Happy Camp

1

1 | Sub-Station as a resident deputy in Soames Bar, California.

2. 3. That the Happy Camp Sub-Station was and is located in Happy Camp, California which is on State Highway 96, which is a remote area of the County of Siskiyou.

4. That on June 4, 1999 I received a Certificate for NCISNET NCIC And NLETS TERMINAL OPERATOR TRAINING from the Department of the Navy, Naval Criminal Investigation Service.

5. That I attended the College of the Redwoods, Administration of Justice Program in 2001.

6. That after completing 800 hours of instruction, on December 14, 2001 I received the P.O.S.T. Certified Basic Law Enforcement Academy certificate.

7. That during my attendance at the College of the Redwoods, Administration of Justice Program in 2001 I served as the class sergeant.

8. That on December 14, 2001 I also receive a Certificate of Completion after successfully completing a forty hour EMS First Responder course approved by the North Coast Emergency Medical Services.

9. That in June 2003 I received Certificates of Achievement from the Emergency Management Institute for completing independent study courses in:
   i.   Animals in Disaster, Awareness and Preparedness,
   ii.  Emergency Planning and
   iii. Decision Making & Problem Solving.

10. That in June 2003 I received Certificates of Completion from the Defense Security Service Academy in:
   i.  Level I Antiterrorism Awareness Training, and
   ii. Personal Security Management Program

11. That on September 2, 2003 I was awarded the Basic Certificate by the State of California, Department of Justice, Commission on Peace Officers Standards and

2

DECLARATION OF NATHAN MENDES

1 | Training (P.O.S.T.).

2 |   12. That on October 6, 2003 I was awarded a certificate of successfully
3 | completion of the Basic SWAT Course from the United States Department of Justice,
4 | Federal Bureau of Investigation.

5 |   13. I received a Certificate of Training for successfully completing a
6 | course in Death Scene Investigation on December 11-13, 2003.

7 |   14. That on February 25, 2005 I was awarded a Certificate of Completion
8 | of a 16 hour course in Drug Identification from the College of the Redwoods.

9 |   15. That in March 2005 I was awarded a Certificate of Achievement for
10 | completing of the Basic Sniper/Observer course from the Alameda County Sheriff's
11 | Office Regional Training Center.

12 |   16. That I attended training courses in self defense entitled Force Option-
13 | Simulator on April 9, 2002, October 29, 2003 and August 23, 2005.

14 |   17. On July 31, 2002 I attended a training course at the College of the
15 | Redwoods entitled Child Abuse Update.

16 |   18. On April 24, 2003 I attended a training course at the Sacramento
17 | County Sheriff's Office entitled Computer Crime Training/Supervision.

18 |   19. On August 27, 2003 I attended a training course at Lassen
19 | Community College entitled S & K-Public Law 280#42.

20 |   20. On October 10, 2003 I attended a training course at the Sacramento
21 | FBI Office entitled Special Weapons & Tactics.

22 |   21. On December 13, 2003 I attended a training course at the Orange
23 | County Sheriff's Office entitled Death Investigation.

24 |   22. On February 25, 2005 I attended a training course at the College of
25 | the Redwoods entitled Drug Influence - 11550 H & S.

26 |   23. My ethnic background is that of Karuk Indian, Pacific Islander
27 | (Hawaiian) and Portuguese.

28 |

DECLARATION OF NATHAN MENDES

24. Karuk Indians are the primary population along State Highway 96 and the Klamath and Salmon Rivers in the area of Happy Camp and Orleans, California.

25. Plaintiff is a Karuk Indian.

26. I have no prejudice toward Karuk Indians.

27. That I joined the United States Marine Corp on December 12, 1995.

28. That I received Marine Combat Training in April 1996.

29. That I received Correctional Specialist training in May 1996.

30. That my primary speciality in the Marine Corp was Correctional Specialist.

31. That I was released from active duty in the Marine Corp. December 11, 1999, but remain in the inactive ready reserve.

32. That from October 2001 through February 2002 I was employed by the Coyote Valley Tribal Police as a tribal police officer.

33. On April 2, 2002 I was employed by the County of Lassen as a Deputy Sheriff.

34. In or about December 2003 or January 2004 I was recalled to active duty in the Marine Corp. and served approximately eight (8) months in Iraq.

35. While in Iraq I was initially assigned as a machine gun crewman and then reassigned as a training officer for the Iraqi special forces and Iraqi police.

36. While in Iraq with the Iraqi special forces and/or the Iraqi police I was involved in firefights being shot at by persons attacking us and returning fire at those attacking us.

37. I have never been told that I suffered Post Traumatic Stress Disorder as a result of my Iraq experiences.

38. I was never treated for Post Traumatic Stress Disorder while in the Marine Corp. or since.

39. I have not suffered from Post Traumatic Stress Disorder as a result

4

of my Iraq experiences.

40. Neither my experiences in Iraq, Post Traumatic Stress Disorder nor any other psychological or emotional condition have ever interfered with, or had an affect on, the performance of my duties as a Deputy Sheriff for either Lassen County or Siskiyou County.

41. That following my release for active duty in the Marine Corp near the end of 2004 I returned to my employment by Lassen County as a Deputy Sheriff.

42. That on September 6, 2005 I applied to Siskiyou County for employment as a Deputy Sheriff, because the pay and benefits in Siskiyou County were better than Lassen County.

43. That I was interviewed by a selection board for the County of Siskiyou consisting of Dave Dunwoody, Elton "Bucky" Jefferson and Glenn Kruger, all members of the Siskiyou County Sheriff's Department.

44. That I obtained from Lassen County and delivered to Siskiyou County a copy of my Lassen County personnel file and a copy of the background investigation done by Lassen County prior to hiring me in hopes of saving Siskiyou County time in conducting their background investigation.

45. On November 6, 2005 I submitted to a psychological examination and psychological testing by David A. Oas, PhD.

46. On November 9, 2005 I was offered conditional employment with the Siskiyou County Sheriff's Department as a Deputy Sheriff pending satisfactory completion of a psychological examination, a comprehensive P.O.S.T. physical and a complete drug screening.

47. On December 4, 2005 I began work as a Deputy Sheriff for the Siskiyou County Sheriff's Department.

48. Upon beginning my employment by the County of Siskiyou as a Deputy Sheriff for the Siskiyou County Sheriff's Department, on December 4, 2005, I was

assigned to Field Training with Filed Training Officers Louis Mero and Robert Rowley.

49. That field training included training in the policies of the Siskiyou County Sheriff's Department, including Section 300 entitled "Use of Force".

50. That field training included, among many other things, training in:

    i. Arrest and control techniques

    ii. Impact weapon qualification

    iii. Department policies in use of force.

    iv. Department policies in use of less-lethal weapons

    v. Procedures for obtaining and using hand-held radios

    vi. Officer safety

    vii. Ethics relating to control over suspects while adhering to the departments use of force policy and observing the civil rights and well being of the suspects.

    viii. Use of Force including legal and ethical issues and force options.

    ix. The amount of force than may be used when effecting an arrest.

    x. The term "reasonable" as it applies to use of force.

    xi. California law and department policies concerning the use of physical force.

    xii. Tactical communication/conflict resolution

51. That I completed field training on or about December 29, 2005.

52. That upon completing field training I was, on or about December 30, 2005, assigned to the Happy Camp Sub-Station as a resident deputy in Soames Bar, California.

53. That on December 31, 2005 at about 8:00 p.m. I was on duty, wearing a full uniform and driving a marked patrol car traveling southbound on Salmon River Road, about 100 yards south of SR 96.

54. At said time and place (¶53) I observed a car parked in the center of

the roadway.

55. At said time and place (¶53) I noticed a male subject running towards me, with another male subject chasing him.

56. At said time and place (¶53) the first subject ran up to my patrol car and screamed that he had been stabbed and needed me to help him. The apparent victim was bleeding from his side and had a limp.

57. At said time and place (¶53) I asked the subject who stabbed him and he pointed to the second subject that I had observed chasing him and said, "He did".

58. At said time and place (¶53) the victim was covered in blood around his torso and was screaming for help.

59. I later identified the victim as, Eugene Christopher White (hereafter "Eugene") and the suspect as, Clarence "Hawk" White III (hereafter "Clarence").

60. At said time and place (¶53) Clarence continued to advance on me so, because he might still have the knife he had stabbed Eugene with, I ordered him at gunpoint to stop and get on the ground.

61. Clarence then stated, "fuck you Mendes" and ran back to the car and got into the passenger seat.

62. I ordered Clarence to get out of the car and he said, "Fuck you Nate I'm not going to jail".

63. Clarence then ran towards me and began swinging at me.

64. As Clarence ran towards me I holstered my weapon and wrestled Clarence to the ground.

65. Clarence and I ended up on the shoulder of the roadway and Clarence

7

DECLARATION OF NATHAN MENDES

was punching me and kicking wildly.

66. As I wrestled with Clarence, Eugene ran towards me and said, "Leave my fucking brother alone".

67. Eugene then began to pull me off of Clarence and yelled, "I know who you are Mendes, and know where you live".

68. I was wrestling with both subjects when my brother, Dale A. Mendes who was driving by stopped to help me.

69. I was able to deploy pepper spray (oleo-resin capsicum) to the face and eyes of Eugene, while I wrestled with Clarence.

70. I did not know if Clarence was still armed with the knife he had stabbed his brother with and I did not want him to have access to his pockets.

71. I decided to apply a carotid restraint (which I am trained to use) so that I could have one arm free to fight with Eugene.

72. Clarence started to give up when Eugene began to punch me and pull my arm away from his brothers' neck.

73. Eugene finally backed away and was holding his eyes when my brother was able place him in the back of my patrol car.

74. Dale was also able to get on the radio of my patrol car and call Dispatch for help.

75. I continued to wrestle with Clarence and we rolled down the embankment towards the river.

76. Clarence was able to get away from me and ran towards the river.

77. I was unable to catch Clarence and returned to my patrol car.

DECLARATION OF NATHAN MENDES

78. I advised Eugene of his rights under Miranda and told him I would only ask him questions about his brother.

79. Eugene was screaming the whole time, but said he understood.

80. I asked Eugene what happened and he said, "I ain't saying shit Mendes".

81. Eugene also stated, "I am sorry for fighting you, but he's my brother".

82. Paramedic Rodney Johnson from Orleans V.F.D. arrived on scene and began to treat Eugene.

83. I observed a puncture wound to the left side of Eugene's torso.

84. The wound continued to bleed and Eugene would not cooperate with the paramedic or me.

85. Eugene kept stating that he knew me and knew where I lived, so I better not hurt his brother.

86. Eugene was extremely intoxicated and was also bleeding from the mouth and face.

87. It was decided not to try and locate Clarence for the night.

88. I had some small cuts on my hands and knees as a result of fighting with Clarence.

89. On January 11, 2006 at about 9:00 a.m. I was on duty, wearing a full uniform and driving a marked patrol car (unit # 5141) in Siskiyou County.

90. I was traveling east bound on State Highway 96, approximately two miles west of the county line, when I observed two male subjects known to me as, Clarence "Hawk" White and Eugene White of Somes Bar.

DECLARATION OF NATHAN MENDES

91. I had obtained Ramey Warrants for the arrest of both subjects on January 10. 2006 for the above described incident where they fought with me and resisted arrest on New Years Eve.

92. At said time and place I observed Clarence and Eugene pushing a car, which was blocking both lanes of the roadway.

93. I stopped and contacted both subjects and was approached by Eugene, who apologized for fighting with me on New Years Eve.

94. I shook Eugene's hand and told him and Clarence that I needed to talk to him about the fight we were involved in on December 31, 2005, described above.

95. As I spoke to them I observed cuts and bruises on the face of Clarence.

96. I asked Clarence if he had been fighting again and he just chuckled.

97. Clarence stood near his car and did not respond when I told him that I needed to talk to him.

98. I walked over to Clarence and took a hold of him by his coat sleeve and wrist, walking him over to my patrol car.

99. In an attempt to avoid Clarence escalating things, as had happened on December 31, 2005, I initially told Clarence that I needed to talk to him about the "other night" and he said, "Fuck you I'm not going to jail".

100. I told him again that I just wanted to talk and he said he was not going to jail.

101. I believed, at that point, that Clarence was not going to talk and would become combative, as he had on December 31, 2005, so I decided to arrest him upon

DECLARATION OF NATHAN MENDES

the warrant.

102. I tried to handcuff him but he pulled away from me.

103. Eugene began to tell me not to take his brother to jail.

104. I feared that both subjects would get violent, as they had on December 31, 2005, so I pepper sprayed Clarence. I believe the use of pepper spray at that time to have been the least amount of force reasonably necessary to effectuate the arrest, avoid escalation of the incident, and avoid further injury to myself.

105. The pepper spray had no effect, and Clarence got mad and started to swing wildly at me with his fists.

106. I was able to do a hair pull takedown on Clarence and got him to the ground, which at that time and under the circumstances I believe to have been the least amount of force reasonably necessary to effectuate the arrest and avoid escalation of the incident and further injury to myself.

107. Clarence continued to resist by rolling, tucking his arms under him and trying to get to his feet.

108. Clarence continued to resist and I wrestled with him for about five minutes, trying to handcuff him while trying to keep Eugene away from me.

109. A person, who I now know to be Earl Crosby, arrived and parked on the shoulder, due to the road being blocked.

110. Earl told Eugene to stay away from Clarence and me.

111. After about five more minutes of resistance by Clarence I was able to get a handcuff on his left wrist.

112. While we wrestled I kept telling Clarence to let me cuff him and to

11

DECLARATION OF NATHAN MENDES

stop fighting.

113. Clarence would not comply and tucked his right arm under his body.

114. I was trying to get a handcuff on his right wrist when I heard what I thought was his arm breaking, but he did not react and kept fighting. I later learned that his arm had fractured. I was using no more force than I believed to be reasonably necessary to arrest and handcuff Clarence and did not intend to break his arm or otherwise injure it. The fracture was as much an accidental result his resistance as my attempting to pull his arm behind his back to handcuff it.

115. I finally got the cuff on Clarence and stood him on his feet. I walked him over to my patrol car.

116. Eugene started to approach me stating, "Jesus is watching" and "you losing your spirituality". I told Eugene not to leave and to wait where he was. Eugene started to tell Earl to "get me outta here". I told Eugene that he had a warrant and he was not to leave.

117. As I was speaking to Eugene, Earl Crosby nodded towards Clarence, who was running on foot with his hands cuffed behind his back.

118. Clarence was running eastbound on State Highway 96, so I advised dispatch, with my hand held radio which was in my hand, that I was in foot pursuit.

119. Clarence ran down an embankment, which was about 25-30 feet to the bottom.

120. About half way down he tripped and rolled falling into a junk pile.

121. Clarence was able to get on his back and began kicking at me when I approached.

12

DECLARATION OF NATHAN MENDES

122. I tried to control his legs but did not want to get kicked.

123. I began to hit Clarence with the ulnar side of my hand wrapped around my radio (because it had been in my hand, in use, as I ran up highway 96 after Clarence), near his shins and-knees, with no more force that I believed to be reasonably necessary to recapture Clarence and to avoid injury to myself.

124. I jumped on top of him, held his head down and told him to stop fighting.

125. That on December 31, 2005, and at all times since, I believed, based on what I understood Eugene White to say to me, that Clarence White had stabbed his brother prior to my coming upon them.

126. I am aware that Dennis Donahue has stated that I to hit Clarence on his head, with my hand wrapped around my radio, but I have no recollection of doing that and do not believe I did, because:

    a. My intention was to prevent him from kicking me,

    b. In looking at the photographs of Clarence following the incident I do not see any bruising or injury, consistent with his having been struck by my radio, where Donahue said I hit Clarence.

127. I was not intentionally using my radio (photographs of which are attached hereto as Exhibits E, F, G & H) as a weapon because of its light weight it does not make a significant weapon. It just happened to be in my hand, because I was using it while running down the road after Clarence.

128. Had I used my baton, which, under the circumstances, I believe I would have been justified in using to prevent injury to myself from his kicking feet, I

13

would have cause significantly more injury. By not using my baton I believe I used restraint in applying force to Clarence.

129. Because of its light weight and rounded corners my radio could not have caused the lacerations on Clarence's head, which I believe he did to himself when he fell down the embankment with his hands handcuffed behind him.

130. I, at no time, struck Clarence in such a way as to cause the lacerations on his head.

131. I asked Clarence if he was done fighting and he said yes.

132. I stood him up and walked towards Donahue so I could use his driveway to get back to the road.

133. I took Clarence to the road and advised dispatch that I need medical to respond, because Clarence was bleeding.

134. Clarence was taken to Fairchild Medical Center in Yreka for treatment of his injuries.

135. That at all times during the incident on January 11, 2006 I believed the that my use of force to arrest Clarence and then to recapture Clarence, under the circumstances, (which include my prior confrontation with Clarence and Eugene as well as his reaction when I first attempted to talk to him), was well within reasonable force as that term is used in Penal Code §§835 and 835a and Siskiyou County Sheriff's Department Policy Number 300.

136. That my intent in initially trying to talk to Clarence, rather than starting with an arrest pursuant to the warrant I had, was to talk him into coming with me quietly, without a physical confrontation like that which had occurred between us on December 31, 2005.

14

DECLARATION OF NATHAN MENDES

137. When it became apparent, from his reaction, that talking to him would not work, I proceeded to arrest him pursuant to the arrest warrant I had, which I believed I had an obligation to do.

138. That in attempting to place Clarence under arrest and to recapture him following his escape, I very calmly, without anger, applied the least amount of force I reasonably thought would work, only escalating the force as his actions made it reasonably necessary.

139. That I am aware of no law or policy pursuant to which the force I used to arrest and recapture Clarence would not be permitted.

140. That I am aware of no law or policy pursuant to which the force I used to arrest and recapture Clarence would not be reasonable under the circumstances.

The facts and circumstances recited herein are within my personal knowledge, and if called as a witness, I can and would competently testify thereto.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 19TH, 2008 at Yreka, California.

*Nathan Mendes*